# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TREVOR ARMBRUSTER, | : | CIVIL NO.: 1:25-cv-00052 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. Introduction.

In this social security action, Plaintiff Trevor Armbruster seeks judicial

review of the final decision of the Commissioner of Social Security

("Commissioner") denying his claim for disability insurance benefits under Title II

of the Social Security Act.  We have jurisdiction under 42 U.S.C. § 405(g).  For the

---

[1] Frank Bisignano is now the Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

reasons set forth below, we will affirm the Commissioner's decision and enter judgment in favor of the Commissioner.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 12-1* to 12-7.[2]  In October 2023, Armbruster protectively filed[3] an application for disability insurance benefits. *See Admin. Tr.* at 179–83.  He contends that he has been disabled since October 21, 2020. *Id.* at 182.  After the Commissioner denied his claim at the initial level and at the reconsideration level of administrative review, Armbruster requested an administrative hearing. *Id.* at 32–56, 90–94, 96–99, 100–01.  In September 2024, Armbruster, along with a non-attorney representative, and a vocational expert testified at a hearing before Administrative Law Judge Richard Guida (the "ALJ"). *Id.* at 18–31, 85–88.  On September 13, 2024, the ALJ denied Armbruster's claim for benefits. *Id.* at 57–79.  Armbruster appealed the ALJ's decision to the Appeals Council, which denied his request for review. *Id.* at 5–10.

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Armbruster's claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id.*

This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In January 2025, Armbruster, represented by counsel, began this action by filing a complaint seeking review of the Commissioner's decision denying his claim. *See Doc. 1*. He requests, among other things, that the court find that he is entitled to benefits, or, in the alternative, remand the case to the Commissioner for a further hearing. *Id.* at 2 (Wherefore Clause).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 10*. The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 11, 12*. The parties filed briefs, *see docs. 15, 17, 18*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v.*

3

*Berryhill*, 587 U.S. 97, 99 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103. Substantial evidence "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Armbruster is disabled, but whether substantial evidence supports the Commissioner's finding

that he is not disabled and whether the Commissioner correctly applied the relevant law.

### B.  Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[4]

---

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)). "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)).  Here, the

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

---

ALJ determined that Armbruster met the insured-status requirements through March 31, 2024. *Admin. Tr.* at 60, 62.

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999). The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

### IV.  The ALJ's Decision.

On September 13, 2024, the ALJ denied Armbruster's claim for benefits. *Admin. Tr.* at 57–79.  He proceeded through the five-step sequential-evaluation process.

#### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Armbruster had not engaged in substantial gainful activity since his alleged onset date of October 21, 2020, through March 31, 2024, his date last insured. *Id.* at 62.

#### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Armbruster had the following severe impairments: bipolar disorder, anxiety disorder, adjustment disorder, and post-traumatic stress disorder. *Id*.  The ALJ also found that Armbruster had several non-severe impairments. *Id*. at 63.

#### C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that Armbruster did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 63–65. Specifically, that ALJ considered Listings 12.06 and

12.15. *Id.* In doing so, he considered the four broad areas of mental functioning set forth in the disability regulations for evaluating mental disorders[5] and in the listings, known as the paragraph B criteria.[6]

The ALJ determined that Armbruster had mild limitations in understanding, remembering or applying information. *Id.* at 63. He acknowledged that Armbruster "alleged he experienced symptoms of racing thoughts and intrusive

---

[5] When "mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019). The regulations set forth a "special technique" used for evaluating mental impairments. *See* 20 C.F. R. § 404.1520a. As part of that "special technique," a claimant's degree of functional limitation is rated in four broad functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* at § 404.1520a(c)(3). A claimant's degree of limitation in these functional areas is rated using "the following five-point scale: None, mild, moderate, marked, and extreme." *Id.* at § 404.1520a(c)(4). The ratings in these four broad functional areas are used at Step 2 to determine if the claimant has a severe mental impairment, and if the claimant has a severe mental impairment, the ratings are also used at Step 3 to determine if the claimant's severe mental impairment meets or equals a listed mental disorder. *Id.* at § 404.1520a(d).

[6] The listings for mental disorders contain either two paragraphs (A and B) or three paragraphs (A, B, and C). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.A.2. Except as to Listing 12.05 (intellectual disorder), paragraph B of each of the listings for the mental disorders sets forth the same four functional criteria as set forth in 20 C.F. R. § 404.1520a, and the listings use the same five-point rating scale as those regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00.A.2.b, 12.00.E, 12.00.F. This is what the ALJ is referring to when he refers to the paragraph B criteria.

thoughts." *Id.*[7]  But the ALJ also noted that Armbruster "reported he did not need help or reminders to take medication, he did not need any special reminders to take care of personal needs and grooming, he did not need to be reminded to go places, and he was able to pay bills, count change, handle a savings account, and use a checkbook/money orders." *Id.*  And Armbruster's "medical records indicate [he] was assessed with clinical examination findings of a normal memory, normal perceptions, a normal thought content, normal cognition, a logical thought process, an intact memory, an intact fund of knowledge, and an intact recent/remote memory." *Id.*

The ALJ determined that Armbruster had moderate limitations in interacting with others. *Id.* at 63.  In this regard, the ALJ noted that Armbruster "has alleged he experienced symptoms of mood swings, impulsiveness, racing thought[s], difficulty sleeping, irritability, nervousness, hypervigilance, and self-isolating behavior." *Id.*  And "he had problems getting along with family, friends, neighbors, or others as he had a 'short temper'"; "he would get irritated easily"; "he had 'problems' with authority figures and he did not get along well with authority figures"; "he did not go anywhere"; and "[h]e alleges he could not be around large groups because he gets stressed out." *Id.* at 63–64.  The ALJ also noted that

---

[7] For readability purposes, here—and elsewhere—when citing or quoting the ALJ's decision, we omit the ALJ's citations to regulations as well as citations to the record.

Armbruster's "medical records indicate [he] has been assessed with clinical examination findings of fair insight, fair judgment, a mildly irritable affect, a constricted affect, fair eye contact, an anxious mood, a depressed mood, a dysphoric mood, fair insight, fair judgment, rapid and pressured speech, limited insight, and limited judgment." *Id*. at 64.  But citing Armbruster's medical records, that ALJ also noted that he "was assessed with clinical examination findings of an appropriate affect, a cooperative attitude, good eye contact, average/good insight, average/good judgment, a pleasant mood, a normal mood, intact language, a normal affect, normal behavior, intact language, a normal thought content, normal judgment, and intact receptive and expressive communication." *Id*.

The ALJ also determined that Armbruster had moderate limitations in concentrating, persisting, or maintaining pace. *Id*.  In this regard, the ALJ explained:

> [Armbruster] has alleged he experienced symptoms of mood swings, impulsiveness, racing thoughts, depressive episodes, manic episodes, panic attacks, and intrusive thoughts. [Armbruster] alleges he worked slowly, he had a hard time adjusting to work like settings, he had a short attention span, he only followed spoken instructions somewhat "ok", and he was only able to pay attention for a couple of minutes. Additionally, [Armbruster]'s medical records indicate [he] has been assessed with clinical examination findings of intrusive thoughts, a depressed mood and a dysphoric mood.
>
> However, he reported he was able to pay bills, count change, handle a savings account, and use a checkbook/money orders, he shopped via computer, and he followed spoken instructions

11

> and written instructions "good."  Additionally, [Armbruster]'s medical records indicate [he] has been assessed with clinical examination findings of normal motor activity, normal attention, calm motor activity, normal motor activity, average/good insight, normal perceptions, a normal thought content, normal cognition, a logical thought process, and intact attention/concentration.

*Id.*

The ALJ further determined that Armbruster had moderate limitations in adapting or managing oneself. *Id.*  He acknowledged that Armbruster "alleged he experienced symptoms of impulsiveness, irritability, hopelessness, anxiousness, a depressed mood, nervousness, suicidal ideation, catastrophic thoughts, and self-isolating behavior" and that "he would pace when he was stressed and he did not handle changes in his routine or stress 'good.'" *Id.*  The ALJ also noted that Armbruster's "medical records indicate [he] has been assessed with clinical examination findings of fair insight, fair judgment, a mildly irritable affect, a constricted affect, fair eye contact, an anxious mood, a depressed mood, a dysphoric mood, limited insight, and limited judgment." *Id.*  But citing Armbruster's medical records, that ALJ also noted that he "was assessed with clinical examination findings of an appropriate affect, a cooperative attitude, good eye contact, average/good insight, average/good judgment, a pleasant mood, a normal mood, intact language, a normal affect, normal behavior, intact language, a normal thought content, normal judgment, and intact receptive and expressive

12

communication." *Id.* at 64–65.  And Armbruster's "grooming and hygiene were noted to be within normal limits; [Armbruster] denied experiencing any significant manic or depressive 'swings'; and [he] denied experiencing any significant depressive symptoms." *Id.* at 65.

"Because [Armbruster]'s mental impairments did not cause as least two 'marked' limitations or one 'extreme' limitation," the ALJ concluded that the paragraph B criteria were not satisfied. *Id.* at 65.  The ALJ recognized that the paragraph B criteria are not an RFC; rather, they "are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process[,]" and the RFC "assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning." *Id.*  And he asserted that the RFC that follows "reflects the degree of limitation" he "has found in the 'paragraph B' mental function analysis." *Id.*  The ALJ also determined that Armbruster did not satisfy the paragraph C criteria. *Id.*

### D.  The RFC.

The ALJ then determined that Armbruster had the RFC to perform a full range of work at all exertional levels with some non-exertional limitations. *Id.* at 65.  He concluded that Armbruster could only perform "[w]ork that was limited to simple and routine tasks, involving only simple, work-related decisions, and with few, if any, workplace changes." *Id.*  He also concluded that Armbruster "was

limited to only occasional interaction with supervisors, coworkers, and the public."
*Id.*

In making this RFC assessment, the ALJ considered Armbruster's testimony and assertions regarding his limitations. *Id.* at 66–67. The ALJ concluded that although Armbruster's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at 67. The ALJ also considered Armbruster's medical records. *Id.* at 67–68. And he considered the statements submitted by Armbruster ex-wife, his mother, and his sister. *Id.* at 71–72.

The ALJ further considered the opinions in the record. *Id.* at 68–71. Specifically, he considered—and found persuasive—the opinion of a state agency medical consultant. *Id.* at 69. He also considered—and found persuasive or generally persuasive—the opinions of three state agency psychological consultants. *Id.* at 68–70. And he considered—and found unpersuasive—the opinion of Dr. Jamie Via, one of Armbruster's treating doctors. *Id.* at 70–71.

The ALJ noted that "[w]hile reviewed and considered as part of the record, statements on issues reserved to the Commissioner, disability examiner findings, decisions by other governmental agencies (see e.g., Exhibits 1D, 3F, and 9F for

disability ratings by the Veterans Administration)[8] and decisions by non-governmental entities are inherently neither valuable nor persuasive to the issue of whether a claimant is disabled under the Social Security Act." *Id*. at 72.  Thus, the ALJ "provided no analysis about how such evidence is considered." *Id*.

The ALJ then summarized the reasons for his RFC assessment:

> As discussed above, [Armbruster]'s allegations regarding his symptoms and limitations are not consistent with all of the evidence of record pertaining to this matter.  However, the undersigned has accommodated some degree of [Armbruster]'s symptoms related to  his mental impairments in his residual functional capacity by limiting [Armbruster] to jobs that entail limitations of simple and routine tasks, involving only simple, work-related decisions, few, if any, workplace changes, and only occasional interaction with supervisors, coworkers, and the public.

*Id*. at 72.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Armbruster had no past relevant work. *Id*.

---

[8] In May 2022, the Veteran's Administration informed Armbruster that "[e]valuation of [his]adjustment disorder with anxiety and depression, chronic, which is currently 70 percent disabling, is increased to 100 percent effective October 20, 2020." *Admin. Tr.* at 159.  Thus, Armbruster has a 100% disability rating from the Veteran's Administration. *Id*.

15

### F. Step Five.

At step five of the sequential-evaluation process, considering Armbruster's age, education, work experience, and RFC, as well as the testimony of the vocational expert, the ALJ found that there were jobs—such as small product assembler, mail sorter, and router—that exist in significant numbers in the national economy that Armbruster could perform. *Id*. at 73.

In sum, the ALJ concluded that Armbruster "was not under a disability, as defined in the Social Security Act, at any time from October 21, 2020, the alleged onset date, through March 31, 2024, the date last insured." *Id*. at 74 (bold omitted). Thus, he denied Armbruster's claim for benefits. *Id*.

## V. Discussion.

Armbruster presents two claims: (1) "The ALJ's mental RFC assessment is unsupported by substantial evidence as his mischaracterization of persuasive medical opinion evidence resulted in his failure to explain why probative limitations were excluded"; and (2) "The ALJ's finding at Step Five is unsupported due to his legally erroneous reliance on vocational expert testimony which presents an unresolved inconsistency." *Doc. 15* at 7–14 (bold omitted). Addressing each claim in turn, we conclude that they are without merit.

**A. The ALJ's mental RFC assessment is supported by substantial evidence.**

Armbruster claims that the ALJ's mental RFC assessment is not supported by substantial evidence because he mischaracterized a medical opinion that he found persuasive and because he failed to adequately explain why he did not include in the RFC the limitations set forth in that medical opinion. Because this claim involves the ALJ's RFC assessment and opinion testimony, before addressing the merits of that claim, we set forth general standards regarding the RFC assessment and the evaluation of opinion testimony.

**1. The RFC.**

"The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting *Hartranft*, 181 F.3d at 359 n.1). In assessing a claimant's RFC, the ALJ must consider all the evidence of record. *Burnett*, 220 F.3d at 121. "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason*, 994 F.2d at 1066). The court's "review of the ALJ's assessment of the

17

plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Wilder v. Kijakazi*, 1:20-CV-492, 2021 WL 4145056, at *6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's] residual functional capacity with the deference required of the substantial evidence standard of review.").

Further, "[s]urveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).  And "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009).  In fact, in evaluating the medical opinion evidence of record, "the ALJ is not only entitled but required to choose between" conflicting medical opinions. *Cotter,* 642 F.2d at 705.

### 2.  Opinion Testimony.

Under the current regulations, the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The most important factors are supportability and consistency. 20 C.F.R.

§§ 404.1520c(a), 416.920c(a).  The ALJ must explain how he or she "considered the supportability and consistency factors for a medical source's medial opinions or prior administrative medical findings in" his or her determination or decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  The ALJ may, but is not required to, explain how he or she considered the remaining three factors in determining the persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  But if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

Supportability and consistency are defined in 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  As the regulations provide, supportability means: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Simply put, supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Commissioner of Social Security*, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021*), adopting report and recommendation*, 2022 WL 717612, at *1 (S.D.N.Y. Mar. 10, 2022).  On the other hand, consistency means: "The more

consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  The consistency factor focuses on "how well a medical source is supported, or not supported, by the entire record." *Acosta Cuevas*, 2021 WL 363682, at *10.

### 3. Dr. Weitzner's Opinion.

As set forth above, the ALJ considered the opinions of three state agency psychological consultants, *see Admin. Tr.* at 68–70, and although Armbruster mentions that there are opinions from multiple state agency consultants, he specifically addresses only the opinion of Dr. Weitzner, *see doc. 15* at 7–11; *doc. 18* at 1–3.  Because Armbruster has not developed an argument regarding the ALJ's consideration of the opinions of the other state agency consultants or the opinion of Armbruster's treating provider,[9] we limit our discussion to the opinion of Dr. Weitzner.

---

[9] Armbruster asserts that "[a]s the ALJ notes in his decision, the only medical opinions as to [his] mental functioning and limitations come from the state agency psychiatric consultants." *Doc. 15* at 8 (citing *Admin. Tr.* at 69–70).  This is false.  The ALJ made no such note, and the state agency psychiatric consultants' opinions are not the only medical opinions as to Armbruster's mental functioning.  There is also the opinion of Dr. Jamie Via, which the ALJ considered and found not persuasive. *Admin. Tr.* at 69–70.

Dr. Weitzner, a state-agency consulting psychologist, reviewed Armbruster's records and completed a report of her assessment on June 30, 2022. *Admin. Tr.* at 33–39. She concluded that Armbruster's mental disorders— "Depressive, Bipolar and Related Disorders" and "Anxiety and Obsessive-Compulsive Disorders"—were severe medically determinable impairments. *Id.* at 35. She completed a Psychiatric Review Technique, and she concluded as to the paragraph B criteria applicable to the relevant listings that Armbruster has mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations concentrating, persisting or maintaining pace; and moderate limitations adapting or managing oneself. *Id.* at 35–36. She further concluded that Armbruster did not meet the Paragraph C criteria. *Id.* at 36.

As part of her report, Dr. Weitzner also completed a Mental Residual Functional Capacity assessment. *Id.* at 37–38. The form on which Dr. Weitzner completed that assessment provides:

> The questions below help determine the individual's ability to perform sustained work activities. However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion. This discussion(s) is documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation). Any other assessment information deemed appropriate may be recorded in the MRFC—Additional Explanation text box.

*Id*. at 37.  Dr. Weitzner answered "No" to the question asking whether Armbruster has understanding and memory limitations. *Id*.

Dr. Weitzner answered "Yes" to the question asking whether Armbruster has sustained concentration and persistence limitations. *Id*.  She rated Armbruster as not significantly limited in the ability to carry out very short and simple instructions; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; and the ability to make simple work-related decisions. *Id*.  But she rated Armbruster as moderately limited in the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id*.  And in a section asking her to "[e]xplain in narrative form the sustained concentration and persistence capacities and/or limitations," Dr. Weitzner wrote: "[Armbruster] may have difficulties attending work regularly and may be impacted by his MH symptoms.  He is able to complete simple tasks and make simple decisions." *Id*. (bold omitted).

22

Dr. Weitzner also answered "Yes" to the question asking whether Armbruster has social interaction limitations. *Id.*  She rated Armbruster as not significantly limited in the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.*  But she rated Armbruster as moderately limited in the ability to interact appropriately with the general public; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id.*  And in a section asking her to "[e]xplain in narrative form the social interaction capacities and/or limitations," Dr. Weitzner wrote: "He distrusts others and gets anxious in public situations.  He does not always take care of his hygiene appropriately." *Id.* (bold omitted).

Dr. Weitzner further answered "Yes" to the question asking whether Armbruster has adaptation limitations. *Id.* at 38.  She rated Armbruster as not significantly limited in the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. *Id.*  But she rated Armbruster as moderately limited in the ability to respond appropriately to changes in the work setting. *Id.*  And in a section asking her to

23

"[e]xplain in narrative form the adaptation capacities and/or limitations," Dr.

Weitzner wrote: "He has limited distress tolerance." *Id*. (bold omitted).

Finally, in a section titled "MRFC Additional Explanation," Dr. Weitzner

wrote:

> [Armbruster] is diagnosed with Bipolar II Disorder and an anxiety disorder.  He did experience trauma as a child and in addition abused alcohol for a period of time.  [Armbruster] was in treatment at the VA Medical Center, though the medications prescribed were not effective; at one point he was hospitalized for a few days (11/21) connected to these issues.  [Armbruster] is now in treatment at DGR Management Inc.: -3/8/22 pt has noticed a nice improvement on new meds.  Mood feels much more stable and he denies any significant manic or depressive symptoms.  4/5/22 c/o increased irritability for a couple weeks. 5/3/22 pt started having fairly serious akathisia after increasing Abilify. Went back to the 5 mg dose.  ADL's: hygiene mixed, prepares simple meals, does not go out due to anxiety with others in public situations, does not go to social events, will only go shopping if not crowded, drives, can pay bills, can follow simple instructions, distrustful of others, does a lot of gaming.  While [Armbruster] has limitations related to his MH impairments, he is able to sustain simple instructions.  He would perform better away from the public and in an environment with minimal time limits.

*Id*. (bold omitted).


### 4. The ALJ did not mischaracterize Dr. Weitzner's opinion.

Armbruster asserts that the ALJ mischaracterized Dr. Weitzner's opinion,

but he does not clearly set forth in what way the ALJ mischaracterized Dr.

24

Weitzner's opinion.  And we are unable to discern based on Armbruster's muddled arguments in what way he thinks the ALJ mischaracterized Dr. Weitzner's opinion.

Armbruster may be suggesting that the ALJ mischaracterized Dr. Weitzner's testimony because the ALJ did not include a limitation to jobs involving one-to-two steps.  We note that in his reply brief, Armbruster suggests that Dr. Weitzner opined that he was limited to jobs involving "one-two steps." *Doc. 18* at 3 ("The conflict between jobs with a reasoning level two and a limitation to one-two steps is relevant because had Dr. Weitzner's limitations been adopted, the RFC would have precluded this level of skilled jobs.").  And in his opening brief, citing *Horos v. Kijakazi*, No. 3:21-CV-01803, 2023 WL 2742754, at *4 (M.D. Pa. Mar. 31, 2023), Armbruster asserts that the ALJ's purported error here "is the exact error for which this District recently remanded another case." *Doc. 15* at 10.  In *Horos*, state agency consultants opined that the claimant was limited to "1-2 step tasks," but the ALJ concluded in the claimant's RFC that she was limited "to 'understanding, remembering or applying simple instructions,' to 'perform[ing] detailed, but uninvolved instructions, generally described as simple routine unskilled work,' and 'to simple work related decisions.'" *Id*. at * 4.  The court in *Horos* agreed with the claimant there that "there is a significant distinction between the 'simple' work with 'uninvolved instructions' set forth in the RFC and the capability to perform

25

'1-2 step tasks' found in the only two medical opinions to address [her] mental residual functional capacity . . . ." *Id*.

To the extent that Armbruster is asserting that the ALJ mischaracterized Dr. Weitzner's testimony because he did not include a limitation to jobs involving one-to-two steps, we reject that suggestion. First, there is a difference between a limitation to jobs involving only one-to-two steps and a limitation—like the limitation the ALJ imposed in this case—to simple and routine tasks. *See id.; Cruz v. Bisignano*, No. 1:24-CV-1966, 2025 WL 2813882, at *7–8 (M.D. Pa. Sept. 30, 2025) (concluding "that 'simple, repetitive tasks' are legally distinct from 'one-and two-step tasks,'" and observing that although the Third Circuit has not addressed this issue, "we are assured of this conclusion because of language in the Dictionary of Occupational Titles ("DOT"), and by the overwhelming support in other courts for this result"); *Cowher v. O'Malley*, No. 3:21-CV-178, 2024 WL 3161865, at *7 (W.D. Pa. June 24, 2024) ("To be sure, a difference exists between an individual capable of following 'simple instructions,' and an individual only capable of following 'very short and simple instructions (i.e., perform one and two step tasks)[.]'" (citations to the record omitted)). And contrary to Armbruster's suggestion, as the above summary of Dr. Weitzner's opinion shows, Dr. Weitzner did not opine that Armbruster was limited to tasks involving only one-to-two-steps.

To the extent that Armbruster is arguing that the ALJ misconstrued Dr. Weitzner's testimony in some other regard, he has not developed an argument in that regard.  It is a litigant's duty to point to specific parts of the record that support his or her contentions; it is not the Court's job to comb through the record looking for evidence to support the claims or to guess at what a litigant's argument is. *Cf. United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) ("Judges are not mind-readers, so parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority.").  Because Armbruster has not set forth how the ALJ purportedly mischaracterized Dr. Weitzner's opinion, we do not address that issue further.

### 5.  The ALJ did not fail to adequately articulate how the limitations set forth by Dr. Weitzner correspond with the limitations he set forth in the RFC.

Armbruster complains about the ALJ's consideration and explanation of Dr. Weitzner's opinion, but he does not argue that the ALJ failed to address the consistency and supportability of that opinion.  Rather, he contends that the ALJ ignored or failed to explain how he addressed certain parts of Dr. Weitzner's opinion.

The ALJ found Dr. Weitzner's opinion generally persuasive. *Admin. Tr.* at 68–69.  He explained that finding as follows:

A State agency psychological consultant[] completed a mental residual functional capacity assessment on June 30, 2022 that indicates [Armbruster] has some moderate limitations pertaining to sustained concentration and persistence, social interaction, and adaptation.  The State agency psychological consultant also completed a psychiatric review technique[] that indicate[s] [Armbruster] has an overall mild degree of limitation pertaining to understanding, remembering, or applying information and an overall moderate degree of limitation pertaining to interacting with others, concentration, persistence, or maintaining pace, and adapting or managing oneself.  In support of the opinion, the State agency psychological consultant provided explanatory comments that include references to symptoms related to [Armbruster]'s mental impairments.  Additionally, the opinion of the State agency psychological consultant is generally consistent with [Armbruster]'s medical records on a longitudinal basis, including clinical examination findings of an appropriate affect, normal motor activity, a cooperative attitude, a normal memory, normal attention good eye contact, normal attention, calm motor activity, normal motor activity, average/good insight, average/good judgment, a pleasant mood[,] normal perception, a normal mood, a normal affect, normal behavior, a normal thought content, normal cognition, a normal memory, normal judgment, a logical thought process, and appropriate hygiene, an intact memory, an intact fund of knowledge intact language, intact attention/concentration, an intact recent/remote memory, intact receptive and expressive communication and notations in [Armbruster]'s medical records indicating [Armbruster]'s grooming and hygiene were noted to be within normal limits, [Armbruster] denied experiencing depression, anxiety, difficulty concentrating, and difficulty with his memory, [Armbruster] reported having good energy, engaging in activities of daily living, and improved sleep, and [Armbruster] denied experiencing any significant depressive symptoms. Thus, the undersigned generally finds the opinion of the State agency psychological consultant persuasive.  However, to fully accommodate [Armbruster]'s symptoms related to his mental impairments, the undersigned has provided a more restrictive

28

residual functional capacity than is indicated by the opinion of the State agency psychological consultant.

*Id*. at 68–69.[10]

Armbruster contends that the ALJ failed to address parts of Dr. Weitzner's opinion and inadequately explained his decision. In this regard, Armbruster contends that the RFC set by the ALJ does not address absences, inability to maintain pace, or inappropriate response to supervision, and he contends that the ALJ did not explain why he did not include in the RFC Dr. Weitzner's opinions regarding his "inability to attend work regularly, respond appropriately to changes in the work setting, and [his] need to work away from the public in an environment with minimal time limits." *Doc. 15* at 9–10. The Commissioner responds that the ALJ was not required to articulate how he considered each of Dr. Weitzner's ratings regarding the multiple individual questions under the four umbrella categories—understanding and memory, sustained concentration and persistence, social interaction, and adaptation—on the Mental Residual Function Capacity form completed by Dr. Weitzner. *Doc. 17* at 6–9. Rather, according to the Commissioner, the ALJ needed to articulate only how he addressed Dr. Weitzner's opinion regarding the four umbrella categories and the supportability and

---

[10] Although the ALJ does not mention Dr. Weitzner by name here, it is clear from the exhibit he references and the date of that exhibit that he is referring to Dr. Weitzner's report.

consistency of Dr. Weitzner's opinion. *Id*.  Armbruster replies that he does not

"contend[] that the ALJ must articulate each of the PRTF [psychiatric review

technique form] findings[.]" *Doc. 18* at 2.  Rather, according to Armbruster, he

contends that the ALJ erred by finding "Dr. Weitzner's opinion persuasive but then

reject[ing] [her] disabling limitations,"[11] without "logical explanation." *Doc. 18* at

2.

We conclude that the ALJ did not err and that his RFC assessment is

supported by substantial evidence.  The ALJ considered Dr. Weitzner's opinion,

and he translated that opinion into the limitations he set forth in the RFC, i.e., that

Armbruster could perform "[w]ork that was limited to simple and routine tasks,

involving only simple, work-related decisions, and with few, if any, workplace

changes[,]" and Armbruster "was limited to only occasional interaction with

supervisors, coworkers, and the public." *Admin. Tr.* at 65.  The ALJ's RFC

assessment that limited Armbruster to work "with few, if any, workplace

changes[,]" and "only occasional interaction with supervisors, coworkers, and the

public[,]" sufficiently accounts for Dr. Weitzner's opinions that Armbruster had

moderate limitations the regarding his response to supervision, his ability respond

---

[11] We note that Dr. Weitzner did not opine that Armbruster's limitations
were disabling. *See Admin. Tr.* at 33–39 (Disability Determination Explanation).
And the determination at the agency level was that Armbruster was not disabled.
*Id*. at 39.

appropriately to changes in the work setting, and his need to work away from the public. That leaves the ALJ's limitations to work "limited to simple and routine tasks, involving only simple, work-related decisions." *Admin. Tr.* at 65. For ease of reference, we will refer to that limitation as a simple-tasks limitation.[12] The question is whether the ALJ adequately explained his decision to impose a simple-tasks limitation after finding Dr. Weitzner's opinion persuasive.

In a related context, the Third Circuit addressed whether an ALJ's RFC simple-tasks limitation is permissible were the ALJ found at step 3 of the five-step sequential evaluation process that the claimant had moderate limitations in concentration, persistent, or pace. *Hess*, 931 F.3d at 208–13. The Third Circuit held that "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" *Id*. at 211. The court explained that a valid explanation is necessary because of the close relationship between a "simple tasks" limitation and concentration, persistence, or pace:

> [S]uch limitations directly encompass and anticipate a minimal
> level of ability in that functional area. "[U]nderstanding,
> carrying out, and remembering simple instructions" includes
> "[t]he ability to maintain concentration and attention for
> extended periods (the approximately 2-hour segments between

---

[12] "A limitation to 'simple tasks' is fundamentally the same as one 'to jobs requiring understanding, remembering, and carrying out only simple instructions and making one simple work-related decisions[.]'" *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 210 (3d Cir. 2019) (citations omitted).

arrival and first break, lunch, second break, and departure)[;] [t]he ability to perform activities within a schedule … [;] [t]he ability to sustain an ordinary routine without special supervision[;] … [and] [t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace and without an unreasonable number and length of rest periods."

*Id.* at 212-13 (citations omitted) (alterations in original).  A valid explanation is necessary to elucidate why the claimant's difficulties are not so significant to prevent him or her from performing simple tasks. *Id.* at 212.  The Third Circuit has adopted a "fact-specific 'valid explanation' approach" and the outcome of each case depends on the particular facts. *Id.* at 213.

The ALJ in *Hess* "highlighted, among other things, the following: mental status examinations and reports that revealed that Hess could function effectively; opinion evidence showing that Hess could do simple work; and Hess's activities of daily living, which demonstrated that he is capable of engaging in a diverse array of 'simple tasks.'" *Id.* at 214.  And the court in *Hess* concluded that the ALJ in that case provided a valid explanation for her limitation to simple tasks given her discussion of the claimant's activities of daily living, his medical records, his mental status examinations and reports, and opinion evidence that he could do simple work. *Id.*

Although Hess dealt with how the ALJ translated her findings of moderate limitations at step 3 to the RFC, the issue here is how the ALJ translated Dr.

Weitzner's opinion regarding Armbruster's moderate limitations to the RFC. Because the issues are similar, we conclude that given that the ALJ found that Dr. Weitzner's opinion finding that Armbruster had moderate limitations was generally persuasive, the issue is whether the ALJ provided a valid explanation for his limitation of Armbruster in the RFC to simple tasks. This is consistent with the general duty of the ALJ to explain his or her decision sufficiently to permit meaningful judicial review. As noted above, the ALJ must set forth reasons for his or her decision. *Burnett*, 220 F.3d at 119. But the ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). Rather, the "ALJ is merely required 'to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.'" *Watters ex rel. L.B. v. Colvin*, No. 3:13-CV-770, 2014 WL 1268566, at *6 (M.D. Pa. Mar. 26, 2014) (quoting *Jones*, 364 F.3d at 505). The ALJ must explain the dispositive reasons for his or her decision. *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024). And the ALJ's decision must be read as whole. *Jones*, 364 F.3d at 505.

Here, we conclude that the ALJ adequately explained his decision. In discussing Dr. Weitzner's opinion and finding it generally persuasive, the ALJ explained that Dr. Weitzner's opinion "is generally consistent with [Armbruster]'s medical records on a longitudinal basis," and he cited clinical examination

findings, notations in Armbruster's medical records, and Armbruster's reports regarding his activities of daily living. *Id*. at 69.  And zooming out from the ALJ's discussion of Dr. Weitzner's opinion to his discussion overall, the ALJ explained why at step three he found Armbruster had moderate limitations as to some of the paragraph B criteria, citing Armbruster's reports of his abilities and his medical records. *Id*. at 64–65.  And in connection with his RFC assessment, the ALJ reviewed in detail the medical records. *Id*. at 67–68.  Further, the ALJ acknowledged Armbruster's testimony and contentions, and he noted that Armbruster received treatment, including at an emergency room. *Id*. 66–68.  The ALJ further noted that Armbruster was prescribed psychotropic medication, which was effective in limiting his symptoms. *Id*. at 68.  The ALJ also considered the opinion evidence, including the opinion of Dr. Weitzner, who like the ALJ, determined that although Armbruster has moderate limitations, "[h]e is able to complete simple tasks[,] . . . make simple decisions," and "sustain simple instructions[.]" *Id*. at 37, 38.  In sum, we conclude that the ALJ adequately explained his simple-tasks limitation.

Although a different factfinder may have imposed greater limitations, we cannot reweigh the evidence. *Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the

34

record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" (citation omitted)).  And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

In sum, the ALJ adequately explained his decision, and substantial evidence supports the ALJ's RFC assessment.

**B. The ALJ's did not commit reversible error at Step Five.**

Armbruster claims that the ALJ's finding at step five is not supported by substantial evidence because the ALJ failed to identify and resolve an apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles concerning the reasoning level requirements of the three jobs identified by the VE.  We conclude that there was no error as two of the three jobs at issue, and even if there was an error as to third, any such error was harmless.

The Social Security Act provides that an individual is disabled only if he cannot do his previous work and if he cannot "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a

35

specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). And the Act further provides that "[f]or purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.* Accordingly, "[a]t the fifth step, the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003) (footnote omitted). That inquiry has two components: one focused on the kind of jobs available to the claimant, and the other focused on the number of such jobs. *Biestek*, 587 U.S. at 100. "The ALJ need[s] to identify the types of jobs [the claimant] could perform notwithstanding his disabilities." *Id.* "And the ALJ need[s] to ascertain whether those kinds of jobs 'exist[] in significant numbers in the national economy.'" *Id.* (quoting 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1)).

"To determine what type of work (if any) a particular claimant is capable of performing, the Commissioner uses a variety of sources of information, including the DOT, the SSA's own regulatory policies and definitions (found in the Code of Federal Regulations ("CFR")), and testimony from VEs." *Zirnsak v. Colvin*, 777

36

F.3d 607, 616 (3d Cir. 2014). "'The DOT is a vocational dictionary that lists and defines all jobs available in the national economy and specifies what qualifications are needed to perform each job.'" *Id*. (quoting *McHerrin v. Astrue,* No. Civil Action No. 09–2035, 2010 WL 3516433, at *3 (E.D. Pa. Aug. 31, 2010)).

Contending that the ALJ had a duty to explain and resolve an apparent conflict, Armbruster cites, SSR 00-4p. SSR 00-04p provides "that before relying on VE [Vocational Expert] or VS [Vocational Specialist] evidence to support a disability determination or decision," an ALJ "must[] [i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO)," and explain "how any conflict that has been identified was resolved." Soc. Sec. Ruling 00-4p, *Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, 2000 WL 1898704 at *1 (S.S.A. Dec. 4, 2000).[13] More specifically, SSR-00-04p provides, in pertinent part:

---

[13] SSR 00-4p was rescinded by SSR 24-3p. *See* Social Security Ruling, SSR 24-3p; Titles II and XVI: Use of Occupational Information and Vocational Specialist and Vocational Expert Evidence in Disability Determinations and Decisions, 89 FR 97158-01, 2024 WL 4988840 (S.S.A. Dec. 6, 2024). SSR 24-3p became effective on January 6, 2025. *Id*. at *97158. The Social Security

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

*Id*. at *2.  SSR 00-4p continues that "[n]either the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict." *Id*.  Rather, "[t]he adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." *Id*.  And regarding reasonable explanations for conflicts or apparent conflicts, SSR 00-4p provides that "[e]vidence from VEs or VSs can include information not listed in the DOT." *Id*.  It acknowledges that:

> The DOT contains information about most, but not all, occupations.  The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces.  The term "occupation," as used in the DOT, refers to the collective description of those jobs.  Each

---

Administration notes that it will use SSR 24-3p beginning on January 6, 2025, and it will apply it to new applications filed on or after that date and to claims that are pending on or after that date, but it "expect[s] that Federal courts will review [its] final decisions using the rules that were in effect at the time [it] issued the decisions." *Id*. at *97159 n.1.  Because the ALJ's decision is the final decision of the Commissioner in this case, and because the ALJ issued his decision on September 13, 2024, before the effective date of SSR 24-3p, SSR 00-4p is applicable here.

occupation represents numerous jobs.  Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling.

The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.  A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

*Id*. at *2-3.

Further, the Third Circuit has observed that "[b]y its terms, SSR 00–4p, 2000 WL 1898704 (S.S.A. Dec. 4) was designed to address the already-well-established (in this Circuit and elsewhere) obligation of an ALJ to develop the record during an adjudicative hearing." *Rutherford*, 399 F.3d at 556.  The Third Circuit has stated that "[a]s a general rule, occupational evidence provided by a VE should be consistent with the occupational evidence presented in the DOT." *Zirnsak*, 777 F.3d at 617 (citing SSR 00-4p, 2000 WL 1898704 at *2).  And "[t]o ensure consistency, courts have imposed an obligation on ALJs to '[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the [DOT].'" *Id.* (citing SSR 00-4p, 2000 WL 1898704 at *1; and *Rutherford,* 399 F.3d at 556).  "Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) 'elicit a reasonable explanation' where an inconsistency does appear,

39

and (3) explain in its decision 'how the conflict was resolved.'" *Id.* (quoting *Burns,* 312 F.3d at 127).  "An ALJ's failure to comply with these requirements may warrant remand in a particular case." *Id.*  But the Third Circuit "has emphasized that the presence of inconsistencies does not *mandate* remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id.* (quoting *Rutherford*, 399 F.3d at 557).

Here, the purported conflict involves the reasoning levels of the jobs identified by the VE, which the ALJ determined Armbruster could perform. Among other qualification categories, the DOT sets forth General Educational Development requirements, and among those requirements are reasoning development levels. *Zirnsak*, 777 F.3d at 616.  "Reasoning levels in the DOT range from level 1 to level 6." *Id.*

The ALJ in this case concluded that there are jobs that exist in significant numbers in the national economy that Armbruster could perform, and he cited three examples—small product assembler, mail sorter, and router. *Admin. Tr.* at 73. The ALJ based that conclusion on the testimony of a vocational expert, who testified that a hypothetical individual of the same age, education, and work experience as Armbruster and who "would be able to perform work that is limited to simple and routine tasks involving simple work-related decisions and with few, if any, workplace changes," and "only occasional interaction with supervisors,

coworkers, and the public" could perform those jobs. *Admin. Tr.* at 29–30.  And

the vocational expert testified that there are 29,000 jobs as small product assembler

in the national economy, 12,000 jobs as mail sorter in the national economy, and

22,000 jobs as router in the national economy. *Id*. at 30.  The ALJ asked the VE if

her testimony was in accordance with the DOT, and the VE answered that it was

with the exception of testimony regarding limitations not addressed in the DOT,

which testimony was based on her vocational experience. Id. at 30–31.

The DOT classifies the occupations of small product assembler and router as

reasoning level 2 occupations *See Dictionary of Occupational Titles* 739.687-030,

1991 WL 680180, and *Dictionary of Occupational Titles,* 222.587-038, 1991 WL

672123.  And the DOT classifies the occupation of mail sorter as a reasoning level

3 occupation. *See Dictionary of Occupational Titles*, 209.687-026, 1991 WL

671813. Armbruster contends that there is a conflict between jobs that require a

reasoning level 2 or 3 and the simple-tasks RFC determined by the ALJ.

We first address the jobs of small product assembler and router, which

require a reasoning level 2.  The DOT defines reasoning level 2 as the ability to

"[a]pply commonsense understanding to carry out detailed but uninvolved written

or oral instructions" and "[d]eal with problems involving a few concrete variables

in or from standardized situations." *See Dictionary of Occupational Titles*,

Appendix C, 1991 WL 688702.  There is no conflict between a reasoning level 2

41

and the simple-tasks RFC in this case.  This is because "[w]orking at reasoning level 2 would not contradict the mandate that [a claimant's] work be simple, routine and repetitive." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004); *see also Gerenza v. Bisignano*, No. 1:24-CV-00154, 2026 WL 27577, at *5 (M.D. Pa. Jan. 5, 2026) ("Because Gerenza is limited to 'simple instructions' rather than 'very short and simple' or 'short and simple instructions,' the jobs that the ALJ identified at step five which require reasoning level two are consistent with the RFC limitation."); *Edwards v. Comm'r of Soc. Sec.*, No. 3:23-CV-01590, 2025 WL 2844484, at *6 (M.D. Pa. Oct. 7, 2025) (finding "[u]pon review of the relevant case law in the Third Circuit, . . . that while a claimant who is limited to 'very short and simple instructions' or 'short and simple instructions' cannot perform jobs identified at reasoning level two, a claimant who is only limited to 'simple instructions' can"). *Scott R. v. Kijakazi*, 643 F. Supp. 3d 483, 496 (D.N.J. 2022) (concluding that "[b]ecause Assembler, Small Products I, has a reasoning level of two, Plaintiff's argument" that there is an unresolved discrepancy between the reasoning level and the RFC, "which him to unskilled, routine, repetitive tasks" "fails"); *Spallone v. Berryhill*, No. 3:17-CV-1152, 2018 WL 2771581, at *11 (M.D. Pa. Apr. 3, 2018) (concluding that "there simply is no irreconcilable conflict between the RFC assessment in this case, which called for Spallone to perform simple routine tasks, and the Step 5 determination that Spallone could perform

42

work at reasoning level 2"), *report and recommendation adopted*, 2018 WL 2770646, at *1 (M.D. Pa. June 8, 2018). And because there is no conflict, the ALJ did not err in relying on those jobs.

The other job identified by the ALJ—mail sorter—is a reasoning level 3 job. The DOT defines reasoning level 3 as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and "[d]eal with problems involving several concrete variables in or from standardized situations." *See Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702. Even assuming for the sake of argument that such a job conflicts with the simple-tasks RFC set by the ALJ and that the ALJ erred by failing to resolve such a conflict, any such error was harmless.

"Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals." *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Thus, a claimant must explain "'how the . . . error to which he points could have made any difference.'" *Id.* (quoting *Shinseki v. Sanders,* 556 U.S. 396, 413 (2009)). "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

Here, because as discussed above, there are jobs— small product assembler and router—that exist in significant numbers in the national economy that are consistent with Armbruster's RFC, any error regarding the job of mail sorter is harmless. *See Lighting-Sobkowski v. O'Malley*, No. 1:23-CV-00844, 2024 WL 3391104, at *1 (M.D. Pa. June 7, 2024) (agreeing with the "numerous judges within this District" who have "conclude[d] that if, even accounting for limitations that were improperly not addressed by an ALJ, there remains one job that exists in significant numbers in the national economy that the claimant is capable of performing, any error is harmless and remand is not required"); *Scott R.*, 643 F. Supp. 3d at 497 (reasoning that the court need not definitively answer the question whether the reasoning development levels for two other jobs conflict with the claimant's RFC, "which limits him to unskilled, routine, repetitive tasks" "because even assuming—without deciding—that this constitutes an error by the ALJ, it is certainly harmless" because "relying on the number of Assembler, Small Products I, jobs alone, . . . would support the ALJ's Step Five findings").

In sum, because any error regarding the job of mail sorter is harmless and because there is no conflict between the reasoning levels of the jobs of small product assembler and router and Armbruster's RFC, the ALJ's step 5 analysis is supported by substantial evidence and there is no reversible error.

44

## VI.  Conclusion.

For the foregoing reasons, we will affirm the decision of the Commissioner.

An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge